## APPLICATION OF DOCTRINE OF RES IPSA LOQUITUR.

Circuit Court of Cuyahoga County.

THE FOSTER CITY PROVISION CO. v. ADOLPH BLAHA.

Decided, March 24, 1911.

*Proof of Negligence in Accident to Employe Through Defect in Ma-
chinery.*

In the case of an injury to plaintiff's arm by the sudden and unex-
pected descent of the plunger in a sausage machine, although the
doctrine of *res ipsa loquitur* does not apply, negligence on the
part of the defendant employer may be inferred from proof of facts
pointing to insufficiency in construction or repair of the machine,
though several distinct defects are alleged and the proof points as
strongly to one of them as the cause of the accident as any other.

*Seaton & Paine,* for plaintiff in error.
*W. B. Beebe* and *A. W. Lamson,* contra.

HENRY, J.; WINCH, J., and MARVIN, J., concur.

A former proceeding in error, No. 4663, growing out of the same original action, was decided by this court June 28, 1910. The opinion by Marvin, J., shows that Blaha had then recovered a verdict and judgment for damages for personal injuries, upon substantially the same allegations and evidence of negligence as are presented upon this record. That judgment was reversed, upon the authority of *The Baltimore & Ohio Railroad Company* v. *Lockwood,* 72 Ohio St., 586, "for error on the part of the court in failing to properly state to the jury the issues in the case." The opinion concludes:

"An examination of the record fails to disclose any other reversible error."

In the present proceeding a re-examination of the evidence is invoked, by the claim of "error in applying the doctrine *res ipsa loquitur* to this case, and in submitting the case to the jury," as well as by the request "for final judgment in this court."

Without encumbering this opinion with an exhaustive analysis of the mechanical details, the clear and candid statement of the facts, presented in the admirable printed brief of the plaintiff in error may be quoted:

"Plaintiff was a sausage maker in the employ of defendant. He lost his right arm below the elbow by reason of an injury received while working at a sausage stuffer.

"Said sausage stuffer consisted of two parts, the upper part being a steam cylinder in an upright position. The lower part a sausage cylinder, open at the top, and situated directly under the steam cylinder, and about two feet below it.

"The steam cylinder was equipped with an ordinary piston rod and piston head. The piston rod was long enough to reach to the bottom of the sausage cylinder below. On the lower end of the piston rod was circular piece of iron that just fitted into the sausage cylinder.

"Steam was admitted into the steam cylinder through a valve box on its side at about its center. This valve box was equipped with an ordinary sliding valve. The valve was connected with an iron handle by a valve stem and two iron rods, the handle and rods forming a system of levers by which the valve was moved up and down.

"In the operation of the machine the sausage cylinder was filled with sausage meat. The handle would then be pulled down, this would slide the valve so that steam would enter the upper end of the steam cylinder and be shut off from the lower end thereof. The steam pressure would drive the piston rod downward, the circular iron plate at the end of the piston rod would enter the sausage cylinder, and the pressure exerted by the steam would force the sausage meat out of a spout at the bottom of the sausage cylinder into cases.

"When the sausage cylinder was emptied, the handle would be pushed up, this would slide the valve upward and reverse the steam pressure, steam would be shut off from the upper end of the steam cylinder and be admitted to the lower end of the piston rod, and its attachments would be driven upward and be retained in position by the pressure of the steam below the piston head. The sausage cylinder would again be filled with meat and the operation repeated.

"This sausage stuffer thus operated just as does a steam engine by the alternate changing of the steam pressure from one end of the steam cylinder to the other, by means of a sliding valve, the valve being moved not automatically as in a steam engine, but by the raising and lowering of this handle by the operator of the stuffer.

"He had finished stuffing a cylinder of sausage meat, he pushed up the handle to its full extent, and the piston rod and its attached circular iron plate, termed by the witness, 'the plunger' went up and was retained in position as usual. He put his right arm and hand into the sausage cylinder to remove a piece of skin, the plunger remained up for about a minute, when without his touching the handle or doing anything to put the machine into operation, a reversal of the steam put the machine into operation, and the plunger was driven downward, his arm was caught between the plunger and the top of the sausage cylinder, and so injured as to require its amputation."

The petition's allegations of negligence on the part of the defendant below are that it

"furnished and provided a second-hand machine in a wornout and defective condition; that the piston head and steam cylinder of the same was so worn, defective and out of repair that the steam was permitted to escape out from the lower to the upper portion of said cylinder. That the valve, connecting parts, pipes,

reversing mechanism and appliances, including said lever, the operation of which caused said piston head and plunger to move up and down, were so worn, defective and out of repair as not to properly discharge and perform the duties of the same in controlling the operations of said piston and said plunger in said cylinders, and that all the parts and appliances connected with said steam cylinder and with said machine, which controlled the operation of the same as herein described, were so worn, and defective and out of repair as to be unsuitable for use, unfit and unable to perform the duty of holding and maintaining said plunger so as to enable this plaintiff, on the occasion of the said injury, to safely place his hand and arm in the said meat cylinder as he was required to do in the operation of said machine; that said machine and all of its parts herein designated had been in such condition for a period of many months prior and down until the time of the plaintiff's injury herein described and all of which was well known to the said defendant.  That the said defendant, well knowing the wornout, second-hand condition of said machine and defective condition thereof, made or caused to be made no inspection thereof at any time for six months prior and down until the time of said plaintiff's said injury and during all of said time negligently and carelessly allowed and permitted said machine to be and remain in said wornout, defective and dangerous condition.  That the said defendant well knowing the wornout and defective condition of said machine and its appliances as herein described caused to be used on the occasion of the plaintiff's injury, an excessively dangerous high steam pressure.  Plaintiff says that by reason of said defective machine, as herein described and of the use of said high dangerously excessive steam pressure, said piston head and said plunger connected therewith as aforesaid, was caused suddenly to drop and this plaintiff was injured thereby as hereinbefore described.''

The defendant below sought to analyze, or separate, these averments of negligence into half a score of independent items; and, by requests presented in writing before argument, it asked to have each item, in turn, eliminated from the case, for want of evidence to support the same.  These requests were all denied, and we are not prepared to say that the court erred in thus ruling.  The evidence in support of the allegations of negligence, was not massed directly upon one or more of these items.

It consisted of many details and circumstances which the jury, in performing their function of drawing inferences of fact, were invited to fit into a mosaic, corresponding to the allegations of negligence in the petition. The items were not entirely independent, but to some extent, at least, were mutually related. Much of the evidence, bearing upon one, bore also directly or indirectly, positively or negatively upon others.

Complaint is made, however, that such negative proof of negligence is nothing else than the application of the doctrine of *res ipsa loquitur*, and that this is inadmissible on this sort of a case. Generally speaking it is true that negligence is not to be inferred merely from the happening of an accident. But this record discloses evidence, positive as well as negative, on the subject of the defective condition of this machine.

In order to demonstrate its claim that no negligence was proved against it, plaintiff in error reclassifies, from the evidence offered by the plaintiff below, the "actors which kept the handle up when pushed up" as follows:

"(a.) The friction at the various points of the lever formed by the handle and the rods that connected it with the valve stem.

"(b.) The friction of the packing around the valve stem.

"(c.) The pressure of the steam on the back of the valve itself."

The plaintiff in error contends that, as shown by the evidence, any one of these factors alone, except perhaps the last, would have sufficed to keep the handle up. We note, however, the positive testimony of the plaintiff's witness, William A. Toole, on page 160 of the bill of exceptions, as follows:

"Q. How is this valve made as to being smooth or not, on its face? A. When it's right it looks like a looking-glass when it is not out.

"Q. Now, would the pressure of the steam alone on that valve, when the lever is up, be sufficient to hold the lever in position and maintain the valve without moving? A. I don't think it would.

"Q. And can you in practice tighten up the nuts to the various—and the bolts holding these various members together, so as to hold the lever up and valve in place, and have it so the lever would work practically in the operation of the machine? A. Yes sir."

At page 394, defendant's witness, William McClellan, the engineer at its plant, when Blaha was hurt, testifies:

·"Q.   What do you say it is that holds the lever up when you put it up?   A. Why, the steam pressure holds it up; helps to hold it up."

At page 396 he testifies further:

"Q.   In this machine, before Blaha was hurt, did the bolts that hold the various members of the lever together, have anything to do with keeping the lever up when it was put up? A. Why, there was a little friction there, not much.
"Q.   Now in packing that stuffing box what, if anything, before Blaha was hurt did the stuffing box have to do with keeping the handle up, I mean the condition the handle was in? A. Why, there was a little friction on the rod, that is all.
"Q.   A little friction on the rod?   A. A little friction on the rod.   That stuffing box just pulled in there tight enough to hold the steam from escaping."

From all this, and other similar evidence, it appears that gravity all the while tended to cause the handle to drop and start the machine, and the combined friction of the lever points, of the valve stem and of the valve itself, was all that kept it from falling.   From time to time the bolts or nuts at the lever joints had to be tightened.   From time to time the valve stem had to be repacked to prevent the escape of steam.   Failing the usual slight friction at these points, the sole remaining reliance became the steam pressure on the valve itself, which Toole testified was not enough to hold the handle up.

True, the engineer says that the lever joints were tight at the time ·of the accident, and there is perhaps no direct and positive evidence of any looseness at either the valve stem or the lever joints.   But it is evident that the engineer never depended upon the "slight friction" at these points as having any proper office or effect in, keeping the handle up.   He relied chiefly upon the steam pressure on the valve, if not wholly upon it.   Such reliance appears to have been of at least doubtful warrant.   The whole mechanism was ill-advised.   Once before and once after the accident whereby Blaha was injured, similar or kindred incidents demonstrated the dangerous char-

acter of the mechanism; and the former of these occurrences tended to affect the owner with notice thereof. In so far as they were otherwise explainable, cross-examination could and did bring out the distinguishing facts. We hold that evidence of these incidents was admissible for the purposes named, to which, in fact, their effect was properly limited at the time the objections thereto were finally overruled.

It is claimed, however, that the application of the *res ipsa loquitur* rule is squarely raised by the fifteenth request of the defendant below to charge before argument. That request was refused by the court and is as follows:

"The testimony of the plaintiff that the handle and plunger of this machine came down without plaintiff doing anything to cause them to come down does not raise a *prima facie* presumption of negligence on the part of defendant in the respects claimed in the petition or in any respect.

"It devolved upon the plaintiff to trace the fault for his injury to the defendant; plaintiff must have presented some affirmative evidence from which there may be a logical inference of negligence, in addition to the mere unexplained descent of the plunger and handle. And unless plaintiff has done so, your verdict must be for the defendant."

The latter part of this request is doubtless correct, and the former part would also be correct if the testimony referred to therein were considered alone. So far, however, as the terms of the request disclosed, the testimony was not to be taken by itself, but in connection with all the other circumstances of the case. In that setting, it might well be inferred by the jury, as a matter of fact, to raise the presumption, or inference of negligence which the request affirms it would raise. The request was therefore misleading and was properly refused.

A similar vice lurks also in the eighteenth request, which was refused. The incident of the plunger's fall some time after the accident, is doubtless explainable as indicated in said request; but, taken with the other circumstances brought out in evidence, it might well have been thought by the jury to show that the friction at other points than the valve itself was insufficient to keep handle and plunger from falling. And whether the mere pressure of steam on the valve to hold the handle and plunger

was sufficient, when the steam was on, was a matter concerning which the other evidence conflicted. It is not necessarily true, therefore, that a descent of the plunger under such circumstances is no "evidence of any defect in the machine."

The general charge is complained of in two respects: first, in that it impliedly authorizes the jury to apply the *res ipsa loquitur* doctrine, and, secondly, in. that it expressly authorizes the jury to infer that excessive steam pressure caused the plunger to fall. The court did correctly charge that proof of negligence may consist of "proof of facts from which negligence may reasonably be presumed;" and he thereafter alluded to, the inference, or presumption, of negligence, which may arise "from physical facts alone," pointing "to insufficiency in the construction or repair of machinery as the producing cause of the accident." Such language does not mean that an inference of defendant's negligence may be drawn from the mere fact of this accident to plaintiff in and by the plunger falling upon his arms, but it does properly intimate that the dangerous character of the mechanism might be inferred from the happening of other similar events, and from this together with other direct or circumstantial evidence, negligence might be inferred.

As to the possibility of causal relation between high steam pressure and the plunger's fall, in such wise as to injure the plaintiff below in the manner complained of, we are not clear, from all the evidence, that, under some circumstances, as, for example, a leakage of steam in the cylinder, high pressure might not suddenly and forcibly have shifted the valve or, at least, have accelerated the descent of the plunger so as to catch, or more severely injure, plaintiff's arm. As the witness Wiegand says, at page 94, it would shoot the plunger down like lightning —get more pressure on."

Finding none of the assigned errors to be well taken, we hold that the judgment must be and it is affirmed.